UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
JULIAN CEPEDA; ALLEN FERREIRA;                           25 Civ. 5409
KASHIF MATTHEWS; JOSHUA MIRANDA;
JONATHAN PEREZ; and ROBIN VALDEZ,                         **CLASS ACTION COMPLAINT**
on their own behalf and on behalf of others              **AND JURY DEMAND**
similarly situated,

                            Plaintiffs,

                    -v-

CITY OF NEW YORK; LYNELLE
MAGINLEY-LIDDLE; FRITZ FRANGÉ;
ERIC M. TAYLOR; LOUIS MOLINA;
CHARLES DANIELS; and CHRISTOPHER
MILLER,

                            Defendants.
-------------------------------------------------------X

          Plaintiffs Julian Cepeda, Allen Ferreira, Kashif Matthews, Joshua Miranda, Jonathan

Perez, and Robin Valdez, by and through their attorneys, Wang Hecker LLP and ALEXANDER

A. REINERT, for their class action Complaint allege as follows:

## **INTRODUCTION**

          1.        This action arises from the unlawful policy and practice of the City of New York

(the "City") of placing incarcerated persons in solitary confinement and segregated confinement

facilities indefinitely without due process and for illegitimate purposes.

          2.        For years, the New York City Department of Correction ("DOC") has designated

two facilities – a portion of West Facility and of North Infirmary Command ("NIC") at Rikers

Island – to house incarcerated people under extremely restrictive conditions, largely deprived of

human contact.  At West Facility, incarcerated persons have been housed in solitary confinement

at least 23 hours per day.  At NIC, incarcerated persons have been allowed contact with at most

one other incarcerated person for a few hours a day.  Incarcerated persons have been placed in these segregated confinement facilities indefinitely, never knowing when or if they ever will be released to a less restrictive setting.

3.      The people who have been placed in segregated confinement at West Facility and/or NIC were not afforded adequate – or, in most cases, any – process to challenge their placement or continuing confinement in these highly restrictive conditions.  Indeed, it appears that Defendants placed these incarcerated persons in these facilities without meaningful process precisely because it was understood that placing them in indefinite segregated confinement violates DOC's own rules and the Constitution.

4.      Defendants' policy and practice of placing incarcerated people in indefinite solitary confinement at West Facility and in indefinite segregated confinement at NIC without adequate pre- or post-placement hearings violates the procedural and substantive components of the Due Process Clause of the Fourteenth Amendment, the Eighth Amendment, and state law.

5.      In *Miller v. City of New York*, 21-cv-2616 (S.D.N.Y.), a class of former and current DOC incarcerated persons successfully challenged this unlawful policy and practice, obtaining a settlement through which the City paid close to $50 million in compensation to more than 2,800 class members and gave assurances that the unlawful policy and practice had ceased by June 30, 2022.

6.      Notwithstanding the City's assurances, it did not in fact discontinue its unlawful policy and practice.  Instead, since July 1, 2022, DOC has continued to house incarcerated persons unlawfully in solitary confinement in West Facility and in segregation confinement in NIC indefinitely without due process and for illegitimate purposes.

7.    Plaintiffs now seek justice for themselves and for the putative class of similarly situated incarcerated people they seek to represent.

## JURISDICTION AND VENUE

8.    This action arises under 42 U.S.C. §§ 1983 and 1988, the Fourteenth Amendment to the United States Constitution, the Eighth Amendment to the United States Constitution, and under state law.

9.    The jurisdiction of this Court is predicated on 28 U.S.C. §§ 1331, 1343, 1367, 2201, and 2202.

10.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the acts complained of occurred in the Southern District of New York.

## JURY DEMAND

11.    Plaintiffs demand a trial by jury in this action.

## PARTIES

12.    Plaintiff Julian Cepeda is a natural person who currently resides in Bronx County, New York.  During his incarceration by the New York City Department of Correction, he was placed in indefinite restrictive confinement on the second floor of NIC.

13.    Plaintiff Allen Ferreira is a natural person who currently resides in Bronx County, New York.  During his incarceration by the New York City Department of Correction, he was placed in indefinite restrictive confinement in both West facility and on the second and/or third floor of NIC.

14.    Plaintiff Kashif Matthews is a natural person who currently resides in Cabarrus County, North Carolina.  During his incarceration by the New York City Department of

Correction, he was placed in indefinite restrictive confinement on the second floor and the third floor of NIC.

15.     Plaintiff Joshua Miranda is a natural person who currently resides in New York County, New York.  During his incarceration by the New York City Department of Correction, he was placed in indefinite restrictive confinement at West Facility.

16.     Plaintiff Jonathan Perez is a natural person who currently resides in New York County, New York.  During his incarceration by the New York City Department of Correction, he was placed in indefinite restrictive confinement on the second floor of NIC, first as a pretrial detainee and continuing as a convicted person.

17.     Plaintiff Robin Valdez is a natural person who currently resides in Pennsylvania. During his incarceration by the New York City Department of Correction, he was placed in indefinite restrictive confinement at West Facility.

18.     Defendant the City of New York is a municipal corporation that, through DOC, operates several detention facilities for incarcerated persons.

19.     The City is responsible for promulgating and implementing policies practices with respect to the use of segregated confinement by DOC and also is responsible for the appointment, training, supervision, and conduct of all DOC personnel.

20.     The City promulgated the policy and practice that is being challenged in this action:  placing incarcerated persons in restrictive confinement on the second and third floors of NIC and in the contagious disease chambers in West Facility without affording due process and for illegitimate purposes.

21.     Defendant Lynelle Maginley-Liddle, who is sued in her personal capacity, is, and at all relevant times was, the Commissioner of DOC.  As such, she was and remains the chief

executive of DOC.  Upon information and belief, Defendant Maginley-Liddle was personally involved in the decision to place incarcerated persons in restrictive confinement on the second and third floors of NIC and in the contagious disease chambers in West Facility without affording due process and for illegitimate purposes.

22.    Defendant Fritz Frangé, who is sued in his personal capacity, is and has been DOC's Senior Deputy Commissioner since November 2024.  In that role, Defendant Frangé directly supervises the Deputy Commissioner of Classification, Custody Management, and Facility Operations.  As such, he was and remains responsible for major classification and custody policies and practices.  Upon information and belief, Defendant Frangé was personally involved in the decision to place incarcerated persons in restrictive confinement on the second and third floors of NIC and in the contagious disease chambers in West Facility without affording due process and for illegitimate purposes.

23.    Defendant Eric M. Taylor, who is sued in his personal capacity, is and has been DOC's Deputy Commissioner of Classification, Custody Management, and Facility Operations since October 2024.  As such, he was and remains responsible for major classification and custody policies and practices.  Upon information and belief, Defendant Taylor was personally involved in the decision to place incarcerated persons in restrictive confinement on the second and third floors of NIC and in the contagious disease chambers in West Facility without affording due process and for illegitimate purposes.

24.    Defendant Louis Molina, who is sued in his personal capacity, was the Commissioner of DOC from early 2022 until late 2023, when Defendant Maginley-Liddle succeeded him.  During that period, he was the chief executive of DOC.  Upon information and belief, Defendant Molina was personally involved in the decision to place incarcerated persons in

restrictive confinement on the second and third floors of NIC and in the contagious disease chambers in West Facility without affording due process and for illegitimate purposes.

25.     Defendant Charles Daniels, who is sued in his personal capacity, was DOC's Senior Deputy Commissioner from September 2023 to November 2024.  In that role, Defendant Daniels directly supervised the Deputy Commissioner of Classification, Custody Management, and Facility Operations.  As such, he was responsible for major classification and custody policies and practices.  Upon information and belief, Defendant Daniels was personally involved in the decision to place incarcerated persons in restrictive confinement on the second and third floors of NIC and in the contagious disease chambers in West Facility without affording due process and for illegitimate purposes.

26.     Defendant Christopher Miller, who is sued in his personal capacity, was DOC's Deputy Commissioner of Classification, Custody Management, and Facility Operations from July 2022 through October 2024.  During that period, he was responsible for major classification and custody policies and practices.  Upon information and belief, Defendant Miller was personally involved in the decision to place incarcerated persons in restrictive confinement on the second and third floors of NIC and in the contagious disease chambers in West Facility without affording due process and for illegitimate purposes.

### FACTUAL AND LEGAL ALLEGATIONS

27.     Defendants were and are collectively responsible for administering the jails operated by DOC.

28.     For decades, DOC's use of restrictive conditions of confinement has been subjected to oversight by the New York City Board of Correction ("BOC"), a nine-person

oversight board that regulates, monitors, and inspects New York City jails to facilitate and support safer, fairer, and more humane conditions of confinement.

29.     Pursuant to Section 626(e) of the New York City Charter, the BOC "shall establish minimum standards for the care, custody, correction, treatment, supervision, and discipline" of all people confined by DOC (the "Minimum Standards").

30.     The BOC's Minimum Standards are mandatory and binding on DOC.

31.     Since well before July 1, 2022, and continuing to this day, Defendants have used West Facility and the second and third floors of NIC as restrictive housing units, in direct contravention of the Minimum Standards and the Constitution.

**Defendants' Resistance to Regulation of Restrictive Housing**

32.     For many years, DOC has consistently resisted limitations on its use of restrictive housing.

33.     As part of that resistance, Defendants have used West Facility and the second and third floors of NIC to impose restrictive conditions on incarcerated people without abiding by restrictions imposed by the BOC.

34.     The BOC initiated rulemaking to consider meaningful proposals to reduce the use of restrictive housing beginning in 2013, culminating in the adoption of rules in 2015 that significantly restricted DOC's use of punitive segregation and other forms of restrictive housing.

35.     Most significantly, and as described in greater detail below, the amended Minimum Standards require that anyone held in punitive segregation be confined for no longer than 30 consecutive days.  Min. St'ds § 1.17(d).

36.     The amended Minimum Standards also created a new housing unit, Enhanced Supervision Housing (ESH), to "separate from the general population those inmates who pose the greatest threats to the safety and security of staff and other inmates."  Min. St'ds § 1.16(a).

37.     The 2015 amendments to the Minimum Standards restricting the use of punitive segregation and creating the ESH imposed strict procedural and substantive requirements governing both when DOC may use restrictive housing and the conditions imposed in restrictive housing.

38.     During the relevant period, Defendants' use of West Facility and the second and third floor of NIC directly violated the BOC's Minimum Standards by imposing conditions stricter than ESH and punitive segregation, without providing any meaningful process.

39.     After the implementation of the 2015 Minimum Standards, the BOC and the New York City Council continued to evaluate DOC's use of restrictive housing,

40.     On January 12, 2016, the BOC initiated rulemaking for regulating the use of all forms of restrictive housing.

41.     In 2019, the New York City Council took further action by adopting a resolution urging the state legislature and governor to enact the Humane Alternatives to Long-Term (HALT) Solitary Confinement Act.

42.     During the course of several years, as DOC continued to use solitary confinement even while incarcerated people suffered serious physical and mental harms as a result, public advocacy highlighted the need for urgent reform.

43.     These efforts culminated with the passage of Local Law 42 and Minimum Standards implementing Local Law 42, both of which became effective on July 28, 2024.  *See* Min St'ds Chapter 6.

44.     Local Law 42 and Chapter 6 of the Minimum Standards eliminate punitive segregation and ESH, imposing even more significant restrictions on DOC's use of restrictive conditions.

45.     Rather than abide by Local Law 42 and Chapter 6 of the Minimum Standards, the City has flouted them.

46.     In 2021, New York State enacted the Humane Alternatives to Long Term Solitary Confinement Act (the "HALT Act"), imposing additional restrictions on the use and duration of solitary confinement in prisons and jails throughout the state, including facilities managed by DOC.

47.     By continuing to use West Facility and the second and third floors of NIC as restrictive housing units, without providing any meaningful process, Defendants have failed to comply with the HALT Act.

48.     Defendants have done so notwithstanding their awareness of the harms caused by restrictive housing and solitary confinement.

49.     Defendants know that solitary confinement is one of the most severe forms of punishment that can be inflicted on human beings.

50.     Defendants know that solitary confinement can precipitate and/or exacerbate the symptoms of mental illness and provoke suicidal, assaultive, and homicidal behavior, self-mutilation, and other pathologic behaviors.

51.     Defendants know that a 2014 study of NYC jails found people held in solitary confinement were nearly seven times more likely to harm themselves and more than six times more likely to commit potentially fatal self-harm.

52.     Defendants know that confinement in West Facility imposes conditions identical to solitary confinement.

53.     Defendants know that confinement on the second and third floors of NIC imposes conditions that resemble in significant degree solitary confinement.

**Defendants' Operation of West Facility and NIC Violates the BOC's Minimum Standard Regarding Out of Cell Time**

54.     During the relevant period, incarcerated persons who were housed in West Facility or on the second or third floors of NIC did not receive the amount of out of cell time required by the Minimum Standards.

55.     During the relevant period, incarcerated persons housed in West Facility were permitted to leave their cells at most for one hour per day.

56.     During that one hour, incarcerated persons were confined in a different cell outside of West Facility, alone, during a so-called "recreation" period.  No recreation equipment was provided to Plaintiffs, nor was congregate recreation permitted.

57.     During the relevant period, incarcerated persons held on the second or third floors of NIC were, at most, only permitted to leave their cell to move to a small adjoining cage that was shared with either one other cell, two other cells, or no other cells.

58.     During the relevant period, incarcerated persons held on the second or third floors of NIC were kept alone in their cells most of the day, except for designated times when they were allowed to move to the small adjacent cage, where there was little to nothing to do.

59.     Because the second and third floors of NIC were often underpopulated, incarcerated persons held there often had no opportunity to congregate with other people held in NIC even if they were housed in a configuration in which the adjacent cages were in theory shared by two or three cells.

60.     Incarcerated persons who were held on the second or third floors of NIC, like those held in West Facility, occasionally were permitted to "recreate" in an outdoor cage, alone, for no more than one hour per day, where they were provided with no recreation equipment and were not permitted to engage in congregate recreation.

61.     These restrictions on out of cell time violate several provisions of the BOC's Minimum Standards.

62.     As a general rule, the Minimum Standards require that people "placed in the most restrictive security status shall only be denied those rights, privileges and opportunities that are directly related to their status and which cannot be provided to them at a different time or place than provided to other prisoners." *See* BOC Min. St'ds § 1.02(f)(2)(v).

63.     The Minimum Standards also provide that "time spent by prisoners confined to their cells should be kept to a minimum and required only when necessary for the safety and security of the facility." *See id.* § 1.05(a)(1).

64.     Except for people confined in punitive segregation or Enhanced Supervision Housing, the Minimum Standards require at least 14 hours of out of cell time. *See id.* § 1.05(b).

65.     Moreover, when incarcerated people are out of their cell, they are required to have the opportunity to "congregate with others and move about their housing area freely . . . and have access to education and programming." *See id.* §1.05(a)(3).

66.     Out of cell time also "must take place in a space outside of, and in an area away from a cell, in a group setting with other people all in the same shared space, without physical barriers separating such people, that is conducive to meaningful and regular social interaction and activity." *See id.* §1.05(a)(2).

67.     When provided recreation time, incarcerated people "shall be provided with adequate indoor and outdoor recreational opportunities," *Id.* §1.06(a), and "shall be permitted to engage in recreation activities within cell corridors and tiers, dayrooms and individual housing units," including but not limited to "table games," "exercise programs," and "arts and crafts activities." *Id.* §1.06(e).

68.     Incarcerated people also must be provided with the opportunity "to exercise their religious beliefs in any manner that does not constitute a clear and present danger to the safety or security of a facility," *id.* § 1.07(b)(1), including by engaging in congregate religious activities, *id.* §§ 1.07(c), (e).

69.     During the relevant period, while confined in West Facility or the second or third floors of NIC, incarcerated persons did not receive the required out of cell time mandated by the Minimum Standards.

70.     When incarcerated persons were outside of their cell, they did not have the opportunity for "meaningful and regular social interaction," "adequate indoor and outdoor recreational activities," or congregate religious activities, all in violation of the Minimum Standards.

**Defendants Declined to Use Established Alternative Housing Units that Would Have Afforded Plaintiffs Greater Substantive and Procedural Protections**

71.     Had Defendants believed that Plaintiffs or other similarly-situated incarcerated persons posed a threat to maintaining safety and security in DOC facilities, the Minimum Standards afforded them lawful avenues to imposing appropriate restrictions.

72.     First, during the relevant period, the Minimum Standards permitted Defendants to use punitive segregation for those people who commit infractions while in custody.

73.    Had they placed plaintiffs in punitive segregation, Defendants could not have held them there for more than 30 consecutive days.  Min. St'ds § 1.17(d).

74.    When Defendants used West Facility and NIC as stealth restrictive housing units, Defendants held incarcerated people in those conditions for more than 30 consecutive days.

75.    Had Defendants placed incarcerated people in punitive segregation, they would have been required to give them at least 7 hours of out of cell time each day.  *Id.* § 1.17(e).

76.    When Defendants used West Facility and NIC as stealth restrictive housing units, Defendants did not provide incarcerated people with 7 hours per day of out of cell time.

77.    Defendants are aware that that "punitive segregation is a severe penalty," Min St'ds § 1.17(a), that it "imposes significant risks of psychological and physical harm on people in custody" that "are intensified for those with pre-existing mental illness or medical conditions and young adults," that "[t]he risk of self-harm and potentially fatal self-harm is also strongly associated with solitary confinement," and that "the hallmarks of solitary confinement – social deprivation and enforced idleness – create these serious health risks and are antithetical to the goals of social integration and positive behavioral change." *Id.* § 6.07(a).

78.    Because placement in punitive segregation imposes significant restrictions on incarcerated people, DOC must follow specific procedural requirements, including providing a hearing, to justify an incarcerated person's placement in punitive segregation.  *Id.* §1.17(c).

79.    When Defendants used West Facility and NIC as stealth restrictive housing units, Defendants did not provide incarcerated people with any of the protections required by Section 1.17 of the Minimum Standards or with meaningful process, including by failing to provide them with a hearing regarding their placement.

80.     During the relevant period, in addition to punitive segregation, the Minimum Standards also permitted Defendants to use ESH "to separate from the general population those inmates who pose the greatest threats to the safety and security of staff and other inmates" and "additionally seeks to promote the rehabilitation of ESH inmates by incentivizing good behavior and by providing necessary programs and therapeutic resources." Min. St'ds § 1.16(a).

81.     Even in ESH, "to the extent the Department imposes restrictions on an ESH inmate that deviate from those imposed on inmates in the general population, such restrictions must be limited to those required to address the specific safety and security threat posed by that individual inmate." Min. St'ds § 1.16(d)(1).

82.     Even in ESH, incarcerated people are required to have at least 7 hours per day of out of cell time and access to programming and recreation.

83.     When Defendants used West Facility and NIC as stealth restrictive housing units, they did not provide incarcerated people with 7 hours per day of out of cell time.

84.     Precisely because ESH imposes greater restrictions on the movement of incarcerated people, no person may be placed in ESH without a prompt placement hearing subject to specific procedural requirements, Min. St'ds §§ 1.16(f), (g), and anyone placed in ESH is entitled to periodic placement review subject to specific procedural requirements, Min. St'ds § 1.16(h).

85.     During the relevant period, no incarcerated persons who were housed in restrictive confinement on the second or third floors of NIC or in West Facility were afforded any of the protections required by Section 1.16 of the Minimum Standards, even though incarcerated persons who were housed in NIC or West Facility experienced greater restrictions than those housed in ESH.

86.    Upon information and belief, Defendants placed incarcerated persons in solitary confinement in West Facility or in segregated confinement in NIC precisely because they knew that the incarcerated persons were not eligible for placement in punitive segregation or ESH and/or because Defendants wished to ignore the due process and other protections DOC's own rules expressly impose to protect incarcerated persons from arbitrary, punitive, and/or unnecessarily restrictive conditions of confinement.

**Defendants' Use of West Facility and the Second and Third Floors of NIC Violates Local Law 42 and Chapter 6 of the Minimum Standards**

87.    The New York City Council enacted Local Law 42 in December 2023, and it became effective July 28, 2024.

88.    Pursuant to Local Law 42, "solitary confinement" means "any placement of an incarcerated person in a cell, other than at night for sleeping for a period not to exceed eight hours in any 24-hour period or during the day for a count not to exceed two hours in any 24-hour period."  New York City Administrative Code ("NYCAC") § 9-167(a)

89.    Local Law 42 prohibits all solitary confinement "unless for the purpose of de-escalation confinement or during emergency lock-ins."  NYCAC § 9-167(b).

90.    Local Law 42 permits the use of "restrictive housing," defined as "any housing area that separates incarcerated persons from the general jail population on the basis of security concerns or discipline, or a housing area that poses restrictions on programs, services, interactions with other incarcerated persons or other conditions of confinement," NYCAC § 9-167(a), but only if DOC holds a hearing and finds that an incarcerated person has "committed a violent grade I offense."  NYCAC § 9-167(a).

91.    Under Local Law 42, confinement in West Facility and the second and third floors of NIC is considered solitary confinement and is unlawful.

15

92.     Although confinement in West Facility and the second and third floors of NIC would also be considered restrictive confinement under Local Law 42, Defendants have placed Plaintiffs and the class they seek to represent in those facilities without providing a hearing or finding that they committed a violent Grade 1 offense.

93.     Effective July 28, 2024, the BOC adopted Chapter 6 of the Minimum Standards to effectuate Local Law 42.

94.     Defendants know that punitive segregation, and the isolation associated with it, is so harmful that BOC prohibited "all forms of punitive segregation," effective July 28, 2024. Min. St'ds § 6.07(b).

95.     Pursuant to Chapter 6, as of July 28, 2024, "the only form of restrictive housing the Department is permitted to operate" is the housing governed by Chapter 6 of the Minimum Standards. *Id.* § 6.07(c).

96.     Chapter 6 further requires that when DOC uses restrictive housing, it must confine people in "the least restrictive setting and for the least amount of time necessary to address the specific reasons for their placement." *Id.* § 6.01(a)(1).

97.     Chapter 6 of the Minimum Standards provides generally that restrictive confinement may not be imposed without due process, including "[i]mposing sanctions that are proportionate to the offenses committed, "[a]pplying disciplinary rules and imposing sanctions fairly and consistently," and "[e]nsuring that people in custody understand the basis for their placement into restrictive housing, and that they understand the basis for any individual restrictions imposed in conjunction with their placement in such housing." *Id.* § 6.01(a)(2).

98.      As with Local Law 42, Chapter 6 of the Minimum Standards defines "restrictive housing" to mean "units where the Department houses people in custody separately from people

housed in the general population on the basis of security concerns or discipline, or a housing area that imposes restrictions on programs, services, interactions with other incarcerated persons or other conditions of confinement." *Id.* § 6.03.

99.    Under Chapter 6, restrictive housing is to be used "to "[s]eparate from the general population a person in custody in response to the person's recent commission of an offense, which significantly threatens the safety and security of other people in custody and staff," "[h]old incarcerated individuals accountable for their misconduct through swift, certain, fair, and transparent processes," "[p]romote prosocial behavior and progression back to general population through utilization of positive incentives, case management services, individual behavior support plans, and individualized evidence-based programming," and "[p]rovide people in custody with meaningful opportunities to socially engage with others and pursue productive activities." *Id.* § 6.08(a).

100.    Section 6.10 of the Minimum Standards provides for restrictive housing "placement criteria," including that "the Department may only confine a person to restrictive housing after a finding within the past thirty (30) days that the person is guilty of having committed a Grade I violent offense" and that the "sentence must be proportional to the infraction charge."

101.    Section 6.13(a) of the Minimum Standards requires that DOC must "discharge an incarcerated person from restrictive housing if such person has not engaged in behavior that presents a specific, significant, and imminent threat to the safety and security of themselves or other persons during the preceding 15 days."

102.    Chapter 6 further requires DOC to discharge any incarcerated person from restrictive housing within 30 days after they have initially been placed there and prohibits anyone

17

from being placed in restrictive housing for more than a total of 60 days in any 12-month period. *Id.* § 6.13(b).

103.    Under Chapter 6, DOC must "meaningfully review" the placement of an individual in restrictive housing at least every 15 days "to determine whether they can be placed outside restrictive housing."  *Id.* § 6.14(a).

104.    Every incarcerated person confined in restrictive housing must receive notice and an opportunity to participate in the period reviews contemplated by Section 6.14(b) of the Minimum Standards.  *Id.* § 6.14(b).

105.    If an incarcerated person is not discharged from restrictive housing after this periodic review, they are entitled to receive a written report explaining why they are remaining in restrictive housing.  *Id.* § 6.14(d).

106.    Even in restrictive confinement, Chapter 6 requires that each incarcerated person "be permitted at least fourteen (14) out-of-cell hours per day."  *Id.* § 6.15.

107.    Even in restrictive confinement, Chapter 6 requires that each incarcerated person must have the opportunity to engage in congregate activities "comparable to those housed outside restrictive housing, including access to at least seven hours per day of out-of-cell congregate programming or activities with groups of people in a group setting all in the same shared space without physical barriers separating such people that is conducive to meaningful and regular social interaction."  *Id.* § 6.16(c).

108.    Section 6.16(i) of the Minimum Standards provides that "[a]ll cells used to house people in restrictive housing shall have access to natural light."

109.    Section 6.19(a) of the Minimum Standards provides that "[t]he Department must provide people in restrictive housing . . . with programming both inside and outside of the cell"

and "shall utilize programming that addresses the unique needs of those in restrictive housing," which "must be informed by research evidence, be age-appropriate, individualized, trauma-informed, including positive incentive behavior modification models, and be tailored to each person's individual behavior support plan."

110.    Because of the harms caused by restrictive housing, Section 6.23 of Chapter 6 imposes substantial due process protections before DOC can place any incarcerated person in restrictive housing, including the following:

a.    The incarcerated person "must receive written notice detailing the charges against them, their rights to legal representation and to attend the disciplinary hearing, the reason for the proposed placement in restrictive housing, and any supporting evidence as soon as practicable, and no later than forty-eight (48) hours prior to the hearing." *Id.* § 6.23(c).

b.    If the incarcerated person "is unable to secure legal representation for the hearing through their counsel of record, the Department shall provide the contact information for one or more law offices providing criminal or civil defense services for people who are financially unable to obtain counsel." *Id.* §6.23(c)(8).

c.    All hearings must be commenced within 3 days of the notice of infraction and must be audibly recorded. *Id.* §§ 6.23(d)(2), 6.23(d)(4).

d.    The incarcerated person must be advised of their rights at the hearing, including the right to legal representation, the right to appear and participate, the right to introduce evidence and witnesses, the right to review DOC's evidence at least 48 hours prior to the hearing, the right to an interpreter, and the right to appeal. *Id.* § 6.23(d)(6).

e. An incarcerated person may only be placed in restrictive housing if DOC proves by a preponderance of the evidence that the incarcerated person is guilty of violating DOC rules and restrictive housing is justified. *Id.* §§ 6.23(a)(1), 6.23(d)(7).

f. Hearing determinations must be reduced to writing and include a "detailed description of the evidence relied upon by the Hearing Adjudicator in reaching such finding," "[t]he sanction imposed," and a "summary of each witness's testimony, including whether the testimony was credited or rejected, with a statement of the reasons therefor." *Id.* § 6.23(e)(2).

g. If DOC fails to comply with the requirements imposed by Section 6.23 of the Minimum Standards, the due process violation warrants dismissal of the charges. *Id.* § 6.23(f).

111. Confinement in West Facility and on the second or third floors of NIC constitutes restrictive housing under the terms of Chapter 6 of the Minimum Standards.

112. Since July 1, 2022, no incarcerated person who has been housed in the second or third floors of NIC or in West Facility has been afforded the protections required by Chapter 6 of the Minimum Standards.

113. Rather than abide by Local Law 42 and Chapter 6 of the Minimum Standards, the City flouted them.

114. On July 27, 2024, Mayor Adams issued Executive Order 624, which invoked his alleged "emergency powers" and purportedly suspended Local Law 42.

115.    On July 27, 2024, Mayor Adams also issued Executive Order 625, which also invoked his alleged "emergency powers" and purportedly suspended Chapter 6 of the Minimum Standards.

116.    On June 30, 2025, Justice Jeffrey H. Pearlman of the New York Supreme Court, New York County, issued a final order vacating both Executive Order 624 and Executive Order 625, holding that they were beyond the scope of the Mayor's powers and unlawful.

117.    Executive Order 624 is void *ab initio*.

118.    Executive Order 625 is void *ab initio*.

119.    Local Law 42 went into effect on July 28, 2024.

120.    Chapter 6 of the Minimum Standards first went into effect on July 9, 2021, and the amendments thereto pursuant to Local Law 42 went into effect on July 28, 2024.

**Defendants' Use of West Facility Violates the BOC's Minimum Standards Regarding Contagious Disease Units**

121.    DOC maintains a contagious disease unit at West Facility.

122.    West Facility contains numerous so-called "Sprung structures" or "Sprungs" (rigid aluminum-framed structures covered by a heavy-duty plastic fabric) each of which in turn contains numerous hermetically sealed solitary confinement chambers.

123.    The purpose of these sealed solitary confinement chambers is to confine incarcerated persons who have been diagnosed with or are suspected of having a contagious disease in a manner that will prevent the spread of such contagious disease.

124.    The use of the contagious disease unit at West Facility is governed by Section 3.02(g) of the Minimum Standards.

125.    Section 3.02(g)(1) of the Minimum Standards provides that "[i]nmates in medical isolation will receive the same rights, privileges and services set forth in these standards for

inmates not in isolation, provided that the exercise of such rights, privileges and services does not pose a threat to the health, safety, or well being of any other inmate, correctional staff or health care personnel."

126.     Section 3.02(g)(2) of the Minimum Standards provides that "[m]edical personnel shall assess the condition of each inmate so segregated at least once each 24 hour period" and that "[a]t least once each week rounds on all segregation inmates must be made by a physician."

127.     Section 3.02(g)(5) of the Minimum Standards provides that "an inmate may be placed in medical isolation only upon the determination of medical personnel that isolation of an inmate is the only means to protect other people from a serious health threat, subsequent to the examination of such inmate."

128.     Section 3.02(g)(5) of the Minimum Standards further provides that "[t]his disposition by the medical personnel shall be in writing in the health care record and shall state:

     (i)   the name of the inmate; and
     (ii)  the facts and medical reasons for the isolation;
     (iii) the date and time of isolation;
     (iv) the duration of isolation, if known; and
     (v)  any other special precautions or treatment deemed necessary by the medical personnel."

129.     Section 3.02(g)(5) of the Minimum Standards further provides that "upon determination by a physician that an inmate in medical isolation no longer presents a serious threat to the health of any person that inmate shall be released from such special housing after the appropriate correctional personnel are advised."

130.     Section 6.30(a) of the Minimum Standards provides that any "placement in contagious disease units . . . shall comply with the requirements for restrictive housing and general population housing concerning out-of-cell time, programming and services."

131.    Section 6.30(a) of the Minimum Standards provides that "[f]or purposes of the prevention of contagious disease, after a referral from health care staff, a person may be held in a medical unit overseen by health care staff, for as limited a time as medically necessary as exclusively determined by health care staff, in the least restrictive environment that is medically appropriate," that "[i]ndividuals in a contagious disease unit must have comparable access as individuals incarcerated in the general population to phone calls, emails, visits, and programming done in a manner consistent with the medical and mental health treatment being received, such as at a physical distance determined appropriate by medical or mental health staff," and that "[s]uch access must be comparable to access provided to persons incarcerated outside of restrictive housing units."

132.    Since July 1, 2022, Defendants have used West Facility in contravention of the Minimum Standards by placing incarcerated people in contagious disease units without complying with Section 3.02 or 6.30 of the Minimum Standards.

133.    Since July 1, 2022, instead of using West Facility to respond to contagious disease threats, Defendants have used West Facility as a stealth restrictive housing unit to evade the requirements imposed by the Minimum Standards and the Constitution.

**Defendants' Use of West Facility and the Second and Third Floors of NIC Violates the New York HALT Act**

134.    In 2021, New York State enacted the HALT Act, imposing additional restrictions on the use and duration of solitary confinement in prisons and jails throughout the state, including facilities managed by DOC.

135.    Correction Law § 2(23) now defines "segregated confinement" to mean "the confinement of an incarcerated individual in any form of cell confinement for more than

seventeen hours a day other than in a facility-wide emergency or for the purpose of providing medical or mental health treatment."

136.    Pursuant to the HALT Act, DOC may only place a person in "segregated confinement for up to three consecutive days and no longer than six days in any thirty day period," unless DOC, "pursuant to an evidentiary hearing, . . . determines by written decision" that the person committed enumerated acts and "determines in writing based on specific objective criteria the acts were so heinous or destructive that placement of the individual in general population housing creates a significant risk of imminent serious physical injury to staff or other incarcerated persons, and creates an unreasonable risk to the security of the facility." Correction Law § 137(6)(k).

137.    In no event may DOC place anyone in segregated confinement for more than 15 consecutive days or more than 20 total days within any 60-day period.  Correction Law § 137(6)(i).

138.    Persons in segregated confinement shall be offered out-of-cell programming at least four hours per day, including at least one hour for recreation.  Correction Law § 137(6)(j)(ii).

139.    Unless specific requirements are met, no person may be placed in segregated confinement without a prior hearing.  Correction Law § 137(6)(l).

140.    Segregated confinement may not be used for protective custody.  Correction Law § 137(6)(k)(iv).

141.    The limitations on the use of segregated confinement apply to DOC facilities. Correction Law § 500-k; 9 NY Comp Codes Rules and Regs § 7006.9.

142.    During the relevant period, confinement in West Facility and the second and third floors of NIC constituted "segregated confinement" under Correction Law § 2(23).

143.    During the relevant period, Defendants operated segregated confinement units in West Facility and on the second and third floors of NIC without abiding by any of the restrictions imposed by HALT, including by: failing to provide a prior hearing at any time; failing to provide the required out of cell time; and confining people in segregated confinement for longer than permitted.

**The _Miller v. City of New York_ Class Action Settlement**

144.    On or about April 12, 2023, the City agreed to settle the _Miller_ Class Action.

145.    As part of the _Miller_ settlement, the City agreed to pay up to approximately $53 million in compensation to thousands of incarcerated persons who had been unlawfully housed in restrictive confinement in West Facility or the second or third floors of NIC.

146.    In connection with the _Miller_ settlement, the City represented that as of June 30, 2022, DOC had stopped using West Facility and the second and third floors of NIC to house incarcerated persons in restrictive confinement unlawfully.

147.    Based on those representations, the _Miller_ settlement only covered placement in West Facility or the second and third floors of NIC through June 30, 2022.

**DOC's Continuing Unlawful Use of West Facility and NIC**

148.    Since July 1, 2022, incarcerated people have been placed in small single occupancy cells on the second and third floors of NIC that, at most, share a small common cage with one other cell.  Such incarcerated persons are kept alone in their cells most of the day, except for designated times when those people with cage-mates are allowed to congregate with their cage-mate in the small indoor cage, where there is nothing to do.

149.    While confined in NIC, Plaintiffs and putative class members have been served all of their meals in their cells or in the indoor cages abutting their cells.

150.    While confined in NIC, Plaintiffs and putative class members have been permitted, at most, one hour per day of "recreation" time, weather permitting, in a small outdoor cage that is akin to a kennel with no exercise equipment.

151.    Since July 1, 2022, in West Facility, Plaintiffs and putative class members have been confined to single-occupancy cells for at least 23 hours per day, seven days per week, socially isolating them from others.

152.    While confined in West Facility, Plaintiffs and putative class members have been served all of their meals in their cells.

153.    While confined in West Facility, Plaintiffs and putative class members have been permitted, at most, one hour per day of "recreation" time, weather permitting, in a small outdoor cage that is akin to a kennel with no exercise equipment.

154.    Normal human conversations are largely impossible for the people who have been placed in solitary confinement in West Facility.

155.    For nearly a decade, Defendants have been aware that their use of West Facility and NIC as stealth restrictive housing units violates applicable law.

156.    On or about September 29, 2016, BOC served DOC with written notice of its formal findings that DOC was operating West Facility as an unlawful restrictive segregation unit (the "BOC Letter").  The BOC Letter expressly found that incarcerated people were placed in West Facility "without *any* due process such as written notice of the placement including the reasons therefor or an opportunity to challenge the placement."  The BOC Letter expressly found that incarcerated persons "are denied access to a full-serviced law library, may be denied the

right to practice their religion in a congregate setting, receive their meals through food slots on their inner cell door, and are confined to individual cages for recreation."

157.    The BOC Letter demanded that DOC immediately afford people held in West Facility certain "due process protections," including "(i) written notification specifying reasons for the placement in this unit; (ii) an opportunity to challenge the placement at a hearing at which the inmate may call witnesses and present documents; (iii) the assignment of a hearing facilitator if necessary; (iv) a written decision; and (v) periodic placement reviews."  The BOC Letter demanded that DOC engage in a prompt review of each person detained at West Facility, including "(i) a review of the security risks posed by providing these individuals with full and equal access to programs and services as required by the Minimum Standards; (ii) a review of each inmate's housing history; (iii) a review of each inmate's mental health care and health care history; and (iv) a comparative review of the security risks posed by incarcerated individuals at the West Facility versus those individuals who are also in protective custody and enhanced restraint status but who are housed in less restrictive settings."

158.    Upon information and belief, Defendants failed to comply with the demands in the BOC Letter and chose knowingly and purposefully to continue their unlawful policy and practice of placing incarcerated people in stealth solitary confinement or other segregated confinement facilities indefinitely without due process and for illegitimate purposes.

**Deprivation of the Named Plaintiffs' Rights**

159.    It is widely known that even physically and mentally healthy persons will suffer harm when placed in isolation.

160.    It is well known that prolonged isolation such as that which the City has imposed at West Facility and NIC tends to cause severe trauma, even after short periods of confinement.

161.    Harms caused by such isolation include headaches, dizziness, heart palpitations, increased pulse, loss of appetite, digestive failures, hypersensitivity to noise and light, an inability to maintain concentration, depression, anxiety, and suicidal ideation.

162.    Prolonged isolation continues to cause harms even after a person is released from detention, increasing the difficulty for individuals who have been detained in jail to function productively in their communities.

163.    Pretrial detainees and parolees who have not been adjudicated to have violated the terms of their parole may not constitutionally be subjected to conditions which are intended to serve as or have the effect of punishment.

164.    Pretrial detainees and parolees who have not been adjudicated to have violated the terms of their parole may not constitutionally be subjected to conditions of confinement that have no reasonable connection to a legitimate non-punitive objective.

165.    All people incarcerated on Rikers Island– including pretrial detainees, parolees who have not been adjudicated to have violated the terms of their parole, and convicted persons serving sentences – have a liberty interest in not being subjected to harsh restrictive confinement.

166.    Defendants may not be deliberately indifferent to conditions of confinement, like those presented by isolated confinement in West Facility and NIC, that expose incarcerated people to a substantial risk of harm.

167.    Neither Plaintiffs nor any of the other putative class members who were placed by Defendants in solitary confinement in West Facility or in segregated confinement at NIC was ever afforded a hearing at which it was determined that such confinement was necessary to maintain security and order.

168.    Instead, Defendants placed people in solitary confinement in West Facility and in segregated confinement at NIC in an arbitrary manner without affording such individuals due process.

169.    Defendants never evaluated on an individual basis the reasonableness or necessity of the extremely restrictive conditions imposed on individuals detained in solitary confinement in West Facility and in segregated confinement at NIC.

170.    Defendants placed individuals in solitary confinement at West Facility and in segregated confinement at NIC indefinitely, depriving them even of the opportunity to look forward to a date certain when they would be placed in less restrictive housing, or the incentive to behave in a manner that would allow them to transfer to less oppressive conditions, and with no periodic reviews of their placements in such highly restrictive settings.

171.    Defendants' policy and practice of placing incarcerated people in indefinite solitary confinement in West Facility and in indefinite segregated confinement at NIC was arbitrary, unrelated to the effective management of safety and security in the facility, and not reasonably related to any legitimate interest in maintaining order in DOC facilities.

172.    Defendants' policy and practice was to place pretrial detainees in indefinite solitary confinement in West Facility, and in indefinite segregated confinement at NIC, for the purpose of punishment and in direct contravention of such persons' right to be free from punishment before the government has secured a formal adjudication of guilt in accordance with due process of law.

173.    Defendants' policy and practice was to place people under parole supervision in indefinite solitary confinement in West Facility, and in indefinite segregated confinement at NIC for the purpose of punishment and in direct contravention of such individuals' right to be free

from punishment before the government has, after a parole revocation hearing, proven that such person has violated the terms of his or her parole.

174.    Defendants' policy and practice of placing incarcerated people in indefinite solitary confinement in West Facility, and in indefinite segregated confinement at NIC, lacked any rational purpose other than punishment, and even if there were such a purpose, such confinement was excessive and not reasonably related to a legitimate governmental objective.

175.    Pursuant to Defendants' policy and practice, when such incarcerated people were placed in indefinite solitary confinement at West Facility and in indefinite segregated confinement at NIC, the City refused to provide the following, in violation of the Fourteenth Amendment's protections:  the opportunity to appear at a hearing concerning the need for the restrictive conditions being imposed, either at the outset or after the conditions were imposed; the opportunity to call witnesses and present rebuttal evidence; and a written statement by the fact-finder as to the evidence relied on and the reason for the action.

176.    Incarcerated people have a liberty interest in not being placed in solitary confinement or segregated confinement arising both from the Fourteenth Amendment itself, by reason of guarantees implicit in the word "liberty," and from an expectation or interest created by state and city laws or policies, including without limitation each of the legal provisions discussed above.

177.    The City's policy and practice of placing incarcerated people in indefinite solitary confinement at West Facility, and in indefinite segregated confinement at NIC, without a pre- or post-placement hearing, deprived them of their liberty interest in not being subjected to highly restrictive conditions of confinement without adequate process.

178.    The City's policy and practice of placing incarcerated people in indefinite solitary confinement at West Facility and in indefinite segregated confinement at NIC, without any periodic review to determine whether the continued detention of such individuals in solitary confinement at West Facility and in segregated confinement at NIC advanced any legitimate penological goals, deprived them of due process.

179.    Defendants' policy and practice of placing incarcerated people in indefinite solitary confinement at West Facility and in indefinite segregated confinement at NIC was and remains so persistent and widespread that it constitutes an official custom or usage of which the City and supervisory authorities must have been aware.

180.    The City has violated the constitutional rights of the Plaintiffs and the putative class by maintaining a policy and practice of placing incarcerated people in indefinite solitary confinement at West Facility and in indefinite segregated confinement at NIC, and/or by permitting the City's employees to maintain a custom of placing incarcerated people in indefinite solitary confinement at West Facility and in indefinite segregated confinement at NIC, and/or by turning a blind eye to this custom, thereby exhibiting deliberate indifference to the violation of the constitutional rights of Plaintiffs and the putative class.

181.    Plaintiffs Cepeda, Ferreira, Matthews, and Perez, were detained at Rikers Island as pretrial detainees.  After he was sentenced, Plaintiff Perez continued to be detained at Rikers Island as a convicted person.

182.    Plaintiff Valdez was detained at Rikers Island as a person under parole supervision who allegedly violated the terms of his parole.

183.    Plaintiff Miranda was a convicted person who was placed in indefinite solitary confinement at West Facility for approximately 90 days.

184.    Plaintiffs did not pose a disproportionate threat to the safety of staff or other incarcerated persons compared to other people held in the Rikers Island general population.

185.    None of the named Plaintiffs received advance written notice, a hearing, the opportunity to defend themselves, the opportunity to establish facts concerning what an appropriate placement should be, or a written statement by a fact-finder before they were placed in these extremely restrictive confinements.

186.    None of the named Plaintiffs was ever afforded a hearing or other opportunity to challenge the lawfulness of their placement in these extremely restrictive confinements.

187.    None of the named Plaintiffs was ever afforded a hearing or other opportunity to challenge the ongoing continuation of their placement in these extremely restrictive confinements.

188.    Upon information and belief, the placement of Plaintiffs in indefinite segregated confinement without a pre- or post-placement hearing was expressly authorized by an official DOC policy.

189.    Upon information and belief, the placement of Plaintiffs in indefinite segregated confinement without a pre- or post-placement hearing was consistent with and part of a widespread official DOC custom and practice.

190.    Plaintiffs Ferreira, Miranda and Valdez were generally confined to their West Facility cells twenty-four hours per day except for an occasional hour of "recreation."  They were isolated and deprived of almost all social interaction with others.

191.    Plaintiffs Cepeda, Ferreira, Matthews, and Perez were placed in isolation cells on the second and third floors of NIC and allowed to interact only with at most one or two other people, for limited periods each day, in a very small indoor cage attached to their cells.

192.    During their confinement at West Facility and NIC, Plaintiffs were subjected to onerous and punitive conditions of confinement that are not imposed upon incarcerated persons held in general population.

193.    Upon information and belief, the City did not evaluate the reasonableness of Plaintiffs' placements in these extremely restrictive settings or the availability of adequate alternatives in light of their circumstances and the circumstances of the facility.

194.    Because of their placement in these extremely restrictive settings at West Facility and NIC, Plaintiffs and the other putative class members suffered mental, emotional, and psychological harm, in addition to loss of liberty.

195.    Solitary confinement is one of the most severe forms of punishment that can be inflicted on human beings.

196.    For years, the City has known that solitary confinement causes serious and permanent harm to incarcerated persons and constitutes punishment.  All Defendants knew and/or should have known that indefinite solitary and segregated confinement in West Facility and NIC exposed incarcerated people to a substantial risk of harm.

197.    The use of segregated confinement in this arbitrary and capricious manner needlessly caused severe pain and suffering to Plaintiffs and similarly situated incarcerated persons.

## CLASS ALLEGATIONS

198.    With respect to their claims for damages, Plaintiffs bring this action on their own behalf and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(l), and 23(b)(3), on behalf of:

> All incarcerated people who were housed in restrictive confinement on the second or third floors of North Infirmary Command or in West Facility at any time on or after July 1, 2022.

199.    The class is so numerous that joinder of all members is impracticable. Upon information and belief, during the past three years, hundreds of incarcerated people in DOC custody were placed in restrictive confinement in these facilities without due process.

200.    Pursuant to the City's policy and practice, none of these people received adequate process before being subjected to such confinement.

201.    Most of the putative class members are economically disadvantaged, making individual lawsuits impracticable.

202.    Judicial economy weighs in favor of avoiding multiple actions challenging the same policy and practice, particularly where individual suits could lead to potentially inconsistent results.

203.    The class members are identifiable using records maintained by the City in the ordinary course of business.

204.    Common questions of law and fact exist for all class members herein and predominate over any questions solely affecting individual members thereof.

205.    Among the questions of law and fact common to members of the class are:

a.    whether the City's policy and practice of placing incarcerated people in restrictive confinement on the second or third floors of NIC or in West Facility without adequate process violated the Eighth Amendment, the Fourteenth Amendment, and/or state law;

b.    whether placing incarcerated people in restrictive confinement on the second or third floors of NIC or in West Facility was for the purpose of punishment and/or had the effect of imposing punishment;

c.    whether Defendants were deliberately indifferent to a substantial risk of harm to the incarcerated people who were placed in restrictive confinement on the second or third floors of NIC or in West Facility;

34

d.  whether placing incarcerated people in restrictive confinement on the second or third floors of NIC or in West Facility was reasonably related to a legitimate non-punitive objective;

e.  whether class members had a liberty interest in avoiding placement in restrictive confinement; and

f.  what process class members were due before and during placement in restrictive confinement on the second or third floors of NIC or in West Facility.

206.  The City is expected to raise common defenses to the claims of all class members herein, including denying that its policy and practice violated the Constitution.

207.  Plaintiffs' claims are typical of those of all putative class members herein, as Plaintiffs' claims arise from the same municipal policy and practice, and Plaintiffs' claims are based on the same legal theories as those of all putative class members herein.

208.  The cause of Plaintiffs' injuries is the same as the cause of the injuries suffered by all putative class members herein, namely the City's policy and practice.

209.  Maintaining this action as a class action is superior to other available methods because individual damages claims are not likely to be feasible.

210.  Plaintiffs are capable of fairly and adequately protecting the interests of all putative class members herein because Plaintiffs do not have any antagonistic interests thereto.

211.  Counsel for Plaintiffs is experienced in civil rights litigation, prisoners' rights litigation, complex litigation, and class actions.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C.§ 1983 - Fourteenth Amendment**
**(Substantive Due Process – Unauthorized Punishment)**

212.  Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

213.    Under the Due Process Clause, pretrial detainees and/or people under parole supervision who have not been adjudicated to be in violation of the terms of their parole may not be punished prior to an adjudication of guilt in accordance with due process of law.

214.    Restrictive confinement may be imposed upon pretrial detainees and/or people under parole supervision who have not been adjudicated to be in violation of the terms of their parole only for a legitimate governmental purpose and not for the purpose of punishment.

215.    Even assuming a legitimate, non-punitive regulatory purpose existed, imposing the conditions of restrictive confinement set forth above was plainly excessive in relation to such purpose.

216.    The City's policy and practice described herein was intended to punish and/or had the effect of punishing Plaintiffs and the putative class members.

217.    The City's policy and practice of placing incarcerated people in indefinite restrictive confinement was particularly punitive because it deprived them of the opportunity to look forward to a date certain when they would be placed in a less restrictive setting.

218.    By placing Plaintiffs and the putative class members in indefinite restrictive confinement under harsh conditions that were not reasonably related to any legitimate interest in maintaining order in the facility, the City punished Plaintiffs and the putative class members in violation of their Fourteenth Amendment right to be free from punishment as pretrial detainees.

219.    As a result of this unconstitutional policy and practice, Plaintiffs and the putative class members suffered and continue to suffer physical, psychological, mental, and/or emotional injuries, as well as loss of liberty.

220.    As a direct and proximate result of the Defendants' policy and practice, Plaintiffs and the putative class members suffered damages in an amount to be proven at trial.

221.    Because Defendants' unlawful conduct was knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative class members are entitled to an award of punitive damages.

### SECOND CLAIM FOR RELIEF
**42 U.S.C. § 1983 - Fourteenth Amendment**
**(Procedural Due Process)**

222.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

223.    By its policy and practice described herein, the City authorized the placement of Plaintiffs and the putative class members in indefinite restrictive confinement without adequate process, violating the Due Process Clause of the Fourteenth Amendment.

224.    Plaintiffs and the putative class members have a liberty interest in avoiding overly and needlessly restrictive conditions of confinement.  This liberty interest arises from both the Due Process Clause of the Fourteenth Amendment, by reason of guarantees implicit in the word "liberty," and from an expectation and interest created by state and city laws and regulations, including without limitation those discussed above.

225.    By placing Plaintiffs and the putative class members in indefinite restrictive confinement without regard for the appropriateness of such confinement and without adequate process, the City violated the right of Plaintiffs and the putative class members to due process.

226.    Neither Plaintiffs nor the putative class members were afforded any pre- or post-placement hearing before or after being placed in restrictive confinement during which it was determined that continued placement in such confinement was reasonably necessary for a legitimate purpose.

227.    As a result of this unconstitutional policy and practice, Plaintiffs and the putative

class members have suffered and continue to suffer physical, psychological, mental, and/or

emotional injuries, as well as loss of liberty.

228.    As a direct and proximate result of the Defendants' policy and practice, Plaintiffs

and the putative class members suffered damages in an amount to be proven at trial.

229.    Because Defendants' unlawful conduct was knowing, purposeful, malicious, and

outrageous, Plaintiffs and the putative class members are entitled to an award of punitive

damages.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C.§ 1983 - Fourteenth Amendment
### (Substantive Due Process – Deliberate Indifference)

230.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully

set forth at length herein.

231.    Under the Due Process Clause, Defendants may not be deliberately indifferent to

conditions of confinement that pose a substantial risk of harm to pretrial detainees and/or people

under parole supervision who have not been adjudicated to be in violation of the terms of their

parole.

232.    Defendants were deliberately indifferent to a substantial risk of harm to Plaintiffs

and the putative class members in violation of their Fourteenth Amendment rights.

233.    Defendants' policy and practice of placing incarcerated people in indefinite

restrictive confinement exhibited deliberate indifference because Defendants were aware and/or

should have been aware that the conditions of confinement in the second and third floors of NIC

or in West Facility posed a risk of serious and permanent harm to people confined there.

234.    As a result of this unconstitutional policy and practice, Plaintiffs and the putative class members suffered and continue to suffer physical, psychological, mental, and/or emotional injuries, as well as loss of liberty.

235.    As a direct and proximate result of the Defendants' policy and practice, Plaintiffs and the putative class members suffered damages in an amount to be proven at trial.

236.    Because Defendants' unlawful conduct was knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative class members are entitled to an award of punitive damages.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C.§ 1983 - Eighth Amendment**
**(Deliberate Indifference)**

237.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

238.    Under the Eighth Amendment, Defendants may not be deliberately indifferent to conditions of confinement that pose a substantial risk of harm to convicted people.

239.    Defendants were deliberately indifferent to a substantial risk of harm to Plaintiffs and the putative class members in violation of their Eighth Amendment rights.

240.    Defendants' policy and practice of placing incarcerated people in indefinite restrictive confinement exhibited deliberate indifference because Defendants were aware that the conditions of confinement in the second and third floors of NIC or in West Facility posed a risk of serious and permanent harm to people confined there.

241.    As a result of this unconstitutional policy and practice, Plaintiffs and the putative class members suffered and continue to suffer physical, psychological, mental, and/or emotional injuries.

242.    As a direct and proximate result of the Defendants' policy and practice, Plaintiffs and the putative class members suffered damages in an amount to be proven at trial.

243.    Because Defendants' unlawful conduct was knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative class members are entitled to an award of punitive damages.

## FIFTH CLAIM FOR RELIEF
### Violation of the HALT Act

244.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

255.    Pursuant to the HALT Act, Defendants may not place incarcerated people in segregated confinement for more than three consecutive days, without meeting certain requirements, and in no event more than fifteen consecutive days.

256.    Pursuant to the HALT Act, Defendants must permit incarcerated people placed in segregated confinement at least four hours of out of cell time.

257.    Pursuant to the HALT Act, Defendants may not place incarcerated people in segregated confinement without a prior hearing.

258.    As a matter of policy and practice, Defendants placed Plaintiffs and the putative class members in segregated confinement in violation of their rights under the HALT Act.

259.    Defendants were aware and/or should have been aware that the conditions of confinement in the second and third floors of NIC or in West Facility posed a risk of serious and permanent harm to people confined there.

260.    As a result of Defendants' unlawful policy and practice, Plaintiffs and the putative class members suffered and continue to suffer physical, psychological, mental, and/or emotional injuries, as well as loss of liberty.

261.    As a direct and proximate result of the Defendants' policy and practice, Plaintiffs and the putative class members suffered damages in an amount to be proven at trial.

262.    Because Defendants' unlawful conduct was knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative class members are entitled to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a.    Declare that the suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(3);

b.    Award compensatory damages in an amount to be determined for all physical, psychological, mental, and emotional injuries, as well as loss of liberty, sustained by Plaintiffs and the class as a result of the policies and practices alleged herein;

c.    Award punitive damages;

d.    Award reasonable attorneys' fees, together with the costs of this action; and

e.    Grant such other further relief as the Court may deem appropriate.

Dated:  June 30, 2025
           New York, New York

Respectfully submitted,

_____
Eric Hecker
Alexander Goldenberg
Daniel Mullkoff
Lily Sawyer-Kaplan
WANG HECKER LLP
111 Broadway, 14th Floor
New York, NY 10006
(212) 620-2600

Alexander A. Reinert
LAW OFFICE OF ALEXANDER A. REINERT LLC
55 Fifth Avenue, Room 1003
New York, NY 10003
(646) 592-6543

*Attorneys for Plaintiffs and the Putative Class*